PD-1157-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 11/12/2015 5:06:29 PM
Accepted 11/13/2015 11:17:00 AM
ABEL ACOSTA
CLERK

PDR #  PD 1157-15

IN THE TEXAS COURT OF CRIMINAL APPEALS
AT AUSTIN, TEXAS

=================================================

# RICKEY ELLISON
Petitioner

v.

# THE STATE OF TEXAS,
Appellee

=================================================

Petitioner's Petition for Discretionary Review to the
Texas Court of Criminal Appeals from his appeal
to the Eleventh District Court of Appeals
in 11- 12 - 00019 -CR

=================================================

FILED IN
COURT OF CRIMINAL APPEALS

November 13, 2015

ABEL ACOSTA, CLERK

Submitted by

Law Office of Alexander L. Calhoun
4301 W. William Cannon Dr., Ste. B-150 # 260
Austin, Texas 78749
tele: 512/ 731 - 3159
fax: 512/ 233- 5946
Email:  alcalhoun@earthlink.net

Oral Argument is Requested

# Table of Contents

Certificate of Parties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Index of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Statement Regarding Oral Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Statement of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Question Presented. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Reason for Review.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Ground for Review (Restated). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

THE COURT OF APPEALS ERRED IN UPHOLDING THE ADMISSION OF BALLISTICS COMPARISON TESTIMONY WHICH NECESSARILY CONVEYED HEARSAY TESTIMONY BY A DECEASED BALLISTICS EXAMINER.

A. Facts in Support of Granting this Petition. . . . . . . . . . . . . . . . . . . . . . . . 2

B. Argument and Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Conclusion and Prayer.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Certificate of Service.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Certificate of Compliance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Appendix A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

# CERTIFICATE OF PARTIES

Pursuant to Rule 38.1(a), Tex.R.App. Pro., Appellant presents the following persons who are parties to, or have an interest in the final judgment in this cause, so that the Court may determine whether its members are disqualified or should recuse themselves:

| | |
|---|---|
| Mr.   Rickey Ellison, TDCJ #   00333498 | Texas Department of Criminal Justice – Allred Unit |
| Mr. Alexander L. Calhoun, Trial & Appellate Atty | 4301 W. William Cannon Dr., Ste. B-150, # 260, Austin, TX 78749 |
| Mr. Paul Walcutt,  Asst. Trial Atty | 600 W. 13th St., Austin, TX 78701 |
| Ms. Rosemary Lehmberg,  Dist. Atty | Blackwell-Thurman Criminal Justice Complex,   509 W. 11th St, Austin, TX 78701 |
| Mr.   Bryan Case, Asst. Dist. Atty (Ret.) Mr.   Brandon Grunewald, Asst. Dist. Atty | Blackwell-Thurman Criminal Justice Complex,   509 W. 11th St, Austin, TX      78701 |
| Judge David Crane, Trial Judge | Blackwell-Thurman Criminal Justice Complex,   509 W. 11th St, Austin, TX      78701 |
| Judge Robert (Bob) Perkins, Retired | |

# Index of Authorities

Cases:

*Aguilar v. State*, 887 S.W.2d 27 (Tex. Cr. App. 1994).. . . . . . . . . .  9, 10, 11, 12,13

*Bagheri v. State*, 119 S.W.3d 755 (Tex.Cr.App. 2003). . . . . . . . . . . . . . . . . . . . 14

*Cole v. State*, 839 S.W.2d 798 (Tex.Cr.App. 1990) .. . . . . . . . . . . . . . . . . . . . . 7, 8

*Ellison v. State*, 11 - 12- 00119 - CR
  (Tex.App. - Eastland, August 13, 2015). . . . . . . . . . . . . . . . . . . . . . . 1, 9, 13

*Hutchinson v. Groskin*, 927 F.2d 722 (2d Cir. 1991). . . . . . . . . . . . . . . . . . . . . . 7

*Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 (2nd Cir. 2013).. . . . . . . . . . . . . 8

*Martinez v. State*, 22 S.W.3d 504 (Tex. Cr. App. 2000).. . . . . . . . . 9, 10, 11, 12, 13

*United States v. Johnson*, 587 F.3d 625 (4th Cir. 2009) . . . . . . . . . . . . . . . . . . . . 7

*Valle v. State*,  109 S.W.3d 500  (Tex.Cr.App. 2003).. . . . . . . . . . . . . . . . . . . . . 8, 9

*Velez v. State*,   AP-76,051  (Tex.Cr.App. 6-13-2012). . . . . . . . . . . . . . . . . . . . . . 7

*Williams v. Illinois*, 567 U.S. ___,  (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Wood v. State*, 299 S.W.3d 200 (Tex.App. - Austin 2009) . . . . . . . . . . . . . . . . . 12


Statutes and Rules:

Tex.R.App.Pro. 44.2(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Tex.R.App.Pro. Rule 66.3 ( c ). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Tex.R.App.Pro. Rule 66.3 ( b ). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Tex.R.Evid. 401. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Miscellaneous Authorities:

Texas Rules of Evidence Handbook  (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## Statement Regarding Oral Argument

Due to the subtle nature of the issue before this Court, Petitioner believes that oral argument may benefit the Court in its understanding of, and resolution of the issue.

TO THE TEXAS COURT OF CRIMINAL APPEALS:

COMES NOW, Petitioner, RICKEY ELLISON, who, by and through his undersigned attorney of record, presents this Petition for Discretionary Review pursuant to Tex.R.App.Pro. Rule 66.1 *et seq.*, and would show as follows:

## Statement of the Case

Petitioner was charged by indictment with Murder. [Clerk's Record ("CR"): 4 - 6]. The jury convicted Appellant of the charged offense. [CR: 53]. Punishment was held before the court, which assessed a sentence of life imprisonment. [CR 62]. Petitioner timely filed a notice of appeal.

## Statement of Procedural History

The Eleventh District Court of Appeals affirmed Petitioner's conviction. *Ellison v. State*, 11 - 12- 00119 - CR (Tex.App. - Eastland, August 13, 2015). Petitioner did not file a Motion for Rehearing. Following a grant of an extension to file the Petition for Discretionary Review, this Petition is due by November 12, 2015.

## Question Presented

WHETHER THE COURT OF APPEALS ERRED IN UPHOLDING THE ADMISSION OF BALLISTICS COMPARISON TESTIMONY WHICH NECESSARILY CONVEYED HEARSAY TESTIMONY BY A DECEASED BALLISTICS EXAMINER.

1

**Reasons for Review**

1.      Review is appropriate and necessary because the Eleventh  District Court of Appeals  has addressed an important issue of the law which conflicts with precedent by this Court and other appellate courts.  Tex.R.App.Pro. Rule 66.3 ( c ).

2.      In the alternative, review is appropriate and necessary  because the Eleventh District Court of Appeals  has addressed an important issue of evidentiary law which has not been addressed by this Court.   Tex.R.App.Pro. Rule 66.3 ( b ).

**Ground for Review (Restated)**

THE COURT OF APPEALS ERRED IN UPHOLDING THE ADMISSION OF BALLISTICS COMPARISON TESTIMONY WHICH NECESSARILY CONVEYED HEARSAY TESTIMONY BY A DECEASED BALLISTICS EXAMINER.

**A.  Facts in Support of Granting this Petition**

This case stems from the delayed prosecution of a "cold" case murder which occurred in Austin, Texas in 1981 but was shelved by the prosecution for 28 years until the State indicted Appellant in  2009, at the behest of an individual associated on the Board of Pardons and Paroles to  instigate a prosecution on Petitioner's unchanged cases in order to influence parole decisions on Petitioner's impending parole.[1]   [CR 7;  Vol. 2 R.R.: 10 - 11, 18 - 22, 24, 52 - 54, 63;  Vol. 3 R.R.: 26 - 28].

---

[1]  Petitioner was convicted in Travis County in 1981 of a related attempted capital murder of Charles Lacey and was serving a life sentence at the time he was indicted in the present case.

The evidence at trial reflected the decedent, Jimmy Milo, a known transvestite prostitute who worked the east side of Austin was killed in the early morning of February 19, 1981.   [Vol. 16 R.R.: 117 - 121, 124, 125, 139 - 141, 144.].  Milo's autopsy reflected he was killed by a single gun-shot to the mouth which severed his spinal cord. [Vol. 17 R.R.: 149 - 150, 154].  A bullet was recovered from the body and given to a detective who attended the autopsy, who subsequently conveyed the bullet to the Department of Public Safety.   [Vol. 17 R.R.: 156, 176, 178].

Later that afternoon, Petitioner abducted a woman,  Barbara Scott as she walked  to her car in a downtown Austin  parking garage, and forced her to drive toward Houston. [Vol. 17 R.R.: 268 - 272].   During the abduction, as they were stopped along the highway, Petitioner shot an individual. [Vol. 17 R.R.: 281 - 284]. Petitioner was later apprehended in Hampstead, Texas and a 2 shot-derringer revolver was discovered in the mud by where Petitioner's car had stopped.   [Vol. 17 R.R.: 74- 78,  81 - 84].  The derringer was turned over to a Travis County Sheriff's deputy. [Vol. 17 R.R.: 85].

In the same time period, law enforcement because involved in the investigation of a body, subsequently believed to have been Cassandra Jackson, which was discovered in the Manor area.    [Vol. 16 R.R.: 204 - 205, 208, 218 - 219].    The

This is referred to below as the Lacey case.

body was transported to the Travis County Morgue where the medical examiner determined the cause of death to be a gunshot to her head. [Vol. 17 R.R.: 154, 156, 174 - 175, 178]. A bullet recovered from the unknown body was also transported to the Department of Public Safety for a ballistic comparison. [Vol. 16 R.R.: 208].

Twenty years later, in January 2001, during a pre-parole interview, Petitioner purportedly made an unrecorded statement that on the day he committed the case for which he was currently serving, he had shot a "cross-dresser" in Austin who had asked him for a cigarette. [Vol. 17 R.R.: 204, 206 - 207, 215].

Six years after the parole interview, cold-case detectives from the Austin Police Department investigating the Jackson and Milo cases met with Petitioner in prison and obtained a recorded verbal statement in which Petitioner admitted to having abducted Jackson in her car from San Antonio, driving her up to the Manor area and then shooting her with a derringer he had found in the car's glove box. [Vol. 16 R.R.: 245; Vol. 30 R.R., State's Exhibit 17]. Afterwards, Petitioner drove into Austin and spoke with a female prostitute, but did not admit to having shot Milo. [Vol. 17 R.R.: 29 - 30]. Petitioner did not recall ever having spoken with the parole officer in 2001 or having admitted to her that he shot a transvestite. [Vol. 30 R.R.: State's Exhibit 17].

The weapon depicted in State's Exhibit 1, a xerox copy of a photo of a

4

derringer, was lost by the Sheriff's Department at some point after the original examination by DPS. [Vol. 17 R.R.: 22 - 23, 48].    The weapon depicted in the Xerox was identified by Jackson's boyfriend as having belonged to him in 1981 and was located in the glove box of the car he had lent her before her disappearance. [Vol. 16 R.R.: 41 - 42, 78 - 79].

The ballistics analyst who had originally received and prepared the ballistic evidence relating to the Milo, Jackson and Lacey case, Fred Rhymer,  was deceased by the time of Petitioner's 2011 trial on the Milo case.   [Vol. 18 R.R.: 40 - 41]. Rhymer had taken  and worked up the evidence when it had been submitted in 1981.  [Vol. 18 R.R.: 18, 19, 23 - 25, 31, 33].   The State presented testimony by Calvin Story,  a ballistics analyst in the DPS lab in 1981.  Story had not been present when the ballistic evidence was received and prepared by Rhymer, but did conduct a verification examination of the prepared ballistic samples, and then, in 2006 re-examined the evidence re-submitted in preparation for the Milo case. [Vol. 18 R.R.: 79,   91 - 92, 98 - 101, 105 - 108, 131].   Story testified that based on the evidence originally submitted in 1981, the bullets taken from  Milo's and Jackson's bodies matched the derringer, State's Exhibit 1, recovered in the case.  [Vol. 18 R.R.: 131, 134 - 135].  Story also testified that based on his re-evalaution of the ballistic evidence in 2006, the bullet recovered from Milo's matched the derringer recovered

5

from Petitioner, State's Exhibit 1.   [Vol. 18 R.R. 127, 131].

Prior to testifying before the jury, Story testified in a hearing outside the jury's presence following Petitioner's objections under the Confrontation Clause and Hearsay Rule.   [Vol. 18 R.R.:16 - 60].   Rhymer worked alone when preparing the comparison bullets  and preparing his work up.  [Vol. 18 R.R.: 28, 44].    Story explained that  Rhymer had been individual to have retrieved the evidence, prepared the paperwork detailing the origins of the evidence – the derringer, and the bullets submitted into evidence –  and prepared the comparison bullet from the submitted derringer.   [Vol. 18 R.R.: 25 - 37].

Although Story later verified Rhymer's  analysis, he relied upon Rhymer's work up to concluded that the sample bullet, against which the evidentiary bullets had been compared, had been fired from the submitted derringer.  [Vol. 18 R.R.: 29 - 30, 32, 34, 37].  Aside from Rhymer's representations and work up indicting  the source of the comparison bullet to the recovered derringer, Story could not have independently determined that the evidentiary bullets were fired from the derringer.  [Vol. 18 R.R.: 23, 26, 27, 29, 35 - 36].

At trial, Petitioner challenged the reliability of his statements to the parole and law enforcement as a result of his long history of paranoid schizophrenia.   [Vol. 17 R.R.: 222; Vol. 19 R.R.: 20].   A forensic psychiatrist  testified explained that

individuals with paranoid schizophrenia had a higher susceptibility to providing false confessions, as well as confabulating information [Vol. 19 R.R.: 15, 16, 19]. Petitioner's demeanor and statements to the detectives in 2007 demonstrated behavioral characteristics of an individual actively experiencing the effects of schizophrenia. [Vol. 19 R.R.: 14 - 15, 30 - 31].

**B.** **Argument and Authority**     1.    The Court of Appeals' decision conflicts with precedent which generally precludes an expert from testifying to inadmissible evidence the jury through the guise of expert testimony.

This Court is confronted with whether the Eleventh District Court of Appeals has misapplied Texas Rules of Evidence 703 and 705 by upholding the admission of hearsay in the guise of expert testimony which was critical to linking evidentiary bullets to the alleged murder weapon, despite the ballistic examiner's lack of any personal knowledge regarding the source of the bullet used for the comparison.

While an expert may be entitled to *consider* inadmissible evidence in the course of forming an opinion the expert may not simply repeat that inadmissible testimony. *See* e.g., *Williams v. Illinois*, 567 U.S. ___, slip op. at 15 (2012) (plurality opinion); *Cole v. State*, 839 S.W.2d 798, 815 - 816 (Tex.Cr.App. 1990)

7

(Maloney, J., concurring); *Hutchinson v. Groskin*, 927 F.2d 722, 725 (2d Cir. 1991); *and*, *United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009). *See also*, *Velez v. State*, AP-76,051 (Tex.Cr.App. 6-13-2012)(unpub). "Although the Rules permit experts some leeway with respect to hearsay evidence, . . . a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2nd Cir. 2013). The Supreme Court has likewise observed that "an expert may base an opinion on facts that are "made known to the expert at or before the hearing, but such reliance does not constitute admissible evidence of this underlying information." *Williams*, ___ U.S. ___, slip op. at 15. *See also*, *id*., at 27 ("Underlying data would not be independently admissible unless proven up by jury [because] . . . experts are generally precluded from disclosing inadmissible evidence to a jury." ) (internal quotations omitted). *See also*, Texas Rules of Evidence Handbook, 710 (2011) ("Rule 703 does not . . . provide a basis for admitting otherwise inadmissible materials simply because an expert has relied on them in, forming an opinion.").

The Texas Rules of Evidence expressly provided that details underlying an expert's testimony are not admissible where there is a danger that the jury will consider such testimony for improper purposes. Tex.R.Evid. 705; *and*, *Valle v. State*,

8

109 S.W.3d 500, 506 (Tex.Cr.App. 2003) (citing *Cole*, 839 S.W.2d at 815).

Improper purposes include the jury's consideration of hearsay testimony for the truth

of the matter asserted, that is, as substantive evidence. *See Valle*, 109 S.W.3d at

506 (upholding exclusion of video statement and transcript revealing details of

defendant's life history by client's mother and utilized by mitigation expert because

of danger that jury would have considered the out-of-court statements as substantive

evidence).

      ii.    The Eleventh Court of Appeals' decision conflicts with general precedent and fails to address the issue posed in Petitioner's case – whether the ballistic expert could convey for substantive purposes inadmissible hearsay under the guise of presenting an opinion.

The Court of Appeals rejected Petitioner's hearsay claim, reciting only the

general rule announced under Tex.R.Evid. 703, which permits an expert to form an

opinion based on otherwise inadmissible evidence:

> Relying upon Rule 703 of the Texas Rules of Evidence, the State contends that Story was permitted to base his opinions on Rhymer's findings even if they constituted inadmissible hearsay if the information was of a type reasonably relied upon by experts in the field. In this regard, Story testified that it is common for ballistics experts to use test bullets created by other experts. We agree with the State's contention.

> Under Rule 703, an expert may base an opinion solely on hearsay. Martinez v. State, 22 S.W.3d 504, 508 (Tex. Crim. App. 2000); Aguilar v. State, 887 S.W.2d 27, 29 & n.8 (Tex. Crim. App. 1994). Based upon Story's testimony, the trial court did not err in overruling Appellant's

hearsay objection.

*Ellison*, 11-12-00019-CR, slip op. at 14.

The Court of Appeal's reliance upon *Martinez v. State*, 22 S.W.3d 504 (Tex. Cr. App. 2000), *and*, *Aguilar v. State*, 887 S.W.2d 27 (Tex. Cr. App. 1994), is inapt given the precise issue in this case. *Martinez* and the *Aguilar* plurality hold that an expert may base his on hearsay evidence, but neither hold that the expert may relate that hearsay content to the jury where the jury will necessarily use the hearsay content for its substantive basis.

The Court of Appeals misconstrued the precise nature of Petitioner's objection, addressing the claim as one addressing whether an expert may base an opinion on hearsay. This reading of the objection was unreasonable, given Petitioner's detailed objection at trial. Petitioner did not dispute that the ballistic expert, Story, could have formed an opinion that the bullets taken from Milo Jackson and Lacey matched the comparison bullet which had been created by the original ballistic examiner, Rhymer. The expert could have formed the opinion that " bullet A" matched "bullet B" which matched " bullet C" and all of which matched "comparison bullet D." This is permitted under Rule 703. What he could not do, however, was *testify* that the recovered bullets ("A," "B," and "C") came from the recovered derringer because the matching comparison bullet ( "D" ) had been fired from the derringer, when the

10

only source of "D"'s origin was Rhymer.   Story did not know the personally know the origin the comparison bullet. He had not been present when it was created for the purposes of conducting a ballistic comparison, and he necessarily relied upon Rhymer's representations and work product that "D" was created from the recovered derringer, State's Exhibit 1.   Rhymer's out-of-court representations that "D" came from the derringer were hearsay, and plainly under *Cole v. State*.   The origin of "D" remained inadmissible hearsay, even if Story had concluded that "A", "B" and "C" matched "D."  While Story would be permitted to make the inferential leap that "A" and "B" were fired from the derringer because he was informed that "D" was fired from the weapon, and "A" through "C" matched "D" this did not render admissible that "A" through "C" were fired from the derringer.   Notable for the purpose of Petitioner's objection in the absence of the hearsay - based link between the evidentiary bullets and the derringer depicted in SX 1, Story's opinion on the ballistics would have failed the threshold standards for relevance. *See* Tex.R.Evid. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence more probable or less probable . . .").   Story could not have testified that "A" and "B" came from the derringer unless he also conveyed that the comparison bullet "C" came from the derringer.

Given the actual argument presented at trial and on appeal, the Court of

Appeal's reliance upon this Court's *Martinez,* and *Aguilar* decisions was misplaced. In both cases this Court rejected a hearsay challenge to the testimony of the State's expert who was relying upon work produce of another (absent) expert. The Court explained that the testifying expert's opinion did not run afoul of the hearsay rule because the opinion itself was "not, and [could] never be, a statement "other than one made by the declarant while testifying at the trial." *Martinez*, 22 S.W.3d at 508 (citing *Aguilar*, 887 S.W.2d at 29). This Court additionally noted that the hearsay rule was not implicated because the underlying details were not offered into evidence." *Ibid*.

Thus, the issue in *Martinez* and *Aguilar* differs from that in Petitioner's case in a fundamental way: the details on which Story based his opinion implicitly and necessarily, though improperly, conveyed to the jury substantive evidence. *See and compare, Wood v. State*, 299 S.W.3d 200, 209 (Tex.App. - Austin 2009) (" Under the circumstances of this case, the disclosure of the out-of-court testimonial statements underlying Dolinak's opinions, even if only for the ostensible purpose of explaining and supporting those opinions, constituted the use of the testimonial statements to prove the truth of the matters stated . . . ."). In the absence of Rhymer's implicit assertions that the evidentiary bullets matched the comparison bullet which, in turn, had been fired from the derringer, Story's opinion would have

12

been irrelevant. Under the circumstances of the case, in testifying of the match Story necessarily conveyed Rhymer's out-of-court assertions for their truth, and not simply to show the basis of the opinion. This was error under the Rules of Evidence, and erroneously applied *Martinez* and *Aguilar*.

> iii. The Eleventh Court of Appeals' alternative holding that the admission of Story's testimony was harmless is substantively unreasonable because it stems from a misstatement of the record.

As an alternative holding, the Court of Appeals concluded that the admission of Story's opinion had been harmless under Tex.R.App.Pro. 44.2(b). *Ellison*, slip op. at 14 - 15. The Court's alternative holding was substantively unreasonable, however, because it applied an incorrect standard as well as misapprehended the nature and significance of the evidence.

The Court of Appeals misunderstood the significance of the derringer in the context of the evidence at trial. The Court asserted that Story need not have testified that the bullets came from the derringer in particular, because he could have testified that the bullets recovered from the Milo, Jackson, and Lacey murders came from the same weapon. *Id*., slip op. at 13. The Court also noted that other witnesses could have testified to Petitioner's possession of the derringer. *Ibid*. But this disregarded the significance that the evidence. The case against Petitioner was largely circumstantial and depended on his possession of the weapon throughout the day of

13

the offense. The extraneous offenses involving Jackson and Lacey was pressed by the State for the express purpose of linking Petitioner to *the* derringer which tied him to the Milo killing: the State's theory being that if Petitioner possessed *the* derringer to shoot Jackson before the Milo killing, and possessed *the* derringer to shoot Lacey afterward, he was the one to have killed Milo with the same weapon. Testimony that Petitioner possessed *a* derringer was not sufficient to link him to *the* derringer, depicted in SX 1, alleged to have been the murder weapon.

Further, the Court of Appeals erroneously applied a sufficiency of the evidence approach to the question of prejudice, in lieu of addressing the evidence as an integrated whole. *See Bagheri v. State*, 119 S.W.3d 755, 763 (Tex.Cr.App. 2003) ("The question is not whether there was sufficient evidence to support the verdict. Instead, the reviewing court should consider the entire record when making this determination . . ."). The Court emphasized selected testimony which tied Petitioner to the Milo shooting – hence, focusing on legal sufficiency, while ignoring contrary evidence, which undermined the soundness of the testimony. While noting Appellant had made an (unrecorded) admission to a parol officer of shooting a transvestite, the Court did not address the challenge to the parole officer's perception of the statement – she admitted to having been severely hearing impaired and Petitioner spoke to her in a low monotone throughout the interview. Similarly, while noting Petitioner had

14

made admissions to shooting Jackson to law enforcement during the 2006 interview, the Court likewise ignored the probative evidence that Petitioner was actively schizophrenic and possibly confabulating his participation in the events. Through its selective focus of the testimony, coupled with its misunderstanding of the the pertinent facts relating to the issue, the Court of Appeals improperly applied its analysis under Rule 44.2(b).

## Conclusion and Prayer

WHEREFORE, PREMISES CONSIDERED, Petitioner respectfully requests this Honorable Court to grant this petition for discretionary review, permit full briefing and argument on this issue, and to subsequently grant such relief to which Petitioner may be entitled.

Respectfully submitted,

Law Office of Alexander L. Calhoun
4301 W. William Cannon Dr., Ste. B-150 # 260
Austin, TX 787049
Tele: 512/ 731-3159
Fax: 512/ 233-5496
Email: alcalhoun@eathlink.net

BY:_/s/ _*Alexander L. Calhoun*_____
Alexander L. Calhoun
State Bar No.: 00787187

15

## Certificate of Service

I hereby certify that a copy of the above and foregoing Petition for Discretionary Review was served upon the following parties on November 13, 2015 by United States Mail:

Travis County District Attorney
P.O. Box 1748
Austin, TX 78711

and

State Prosecuting Attorney
P.O. Box 13046
Capitol Station
Austin, Texas 78711

/s/   *Alexander L. Calhoun*
Alexander L. Calhoun


## Certificate of Compliance

I hereby certify that the foregoing Petition for Discretionary Review was created in 14 point type, Times New Roman font, and consists of **3871** words.

/s/   *Alexander L. Calhoun*
Alexander L. Calhoun

Appendix A

***Rickey Ellison v. State of Texas***,   No. 11- 12- 00019-CR
(Tex.App. – Eastland, August 15, 2015)

17



In The

# Eleventh Court of Appeals

_____

No. 11-12-00019-CR
_____

**RICKEY ELLISON, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 331st District Court**
**Travis County, Texas**
**Trial Court Cause No. D-1-DC-09-900320**

### O P I N I O N

The jury convicted Rickey Ellison of murder. The trial court assessed Appellant's punishment at confinement for life in the Institutional Division of the Texas Department of Criminal Justice. We affirm.

*Background Facts*

This appeal arises from Appellant's conviction in 2011 for the murder of Jimmy Milo on or about February 19, 1981. Appellant does not challenge the sufficiency of the evidence to support his conviction. However, a summary of the evidence offered at trial is necessary to provide context for Appellant's issues on appeal and our analysis of those issues. As set forth in greater detail below, the State

alleges that Appellant engaged in a crime spree in February of 1981 that resulted in the murder of Cassandra Jackson, the murder of Jimmy Milo, the abduction of Barbara Bailey Scott, and the attempted capital murder of Deputy Charles B. Lacey. The State further contends that Appellant used the same gun to commit these crimes. Among other things, Appellant contends that his rights under the Confrontation Clause were violated by the State's ballistics evidence linking him to a murder occurring thirty years prior to his conviction.

*Murder of Cassandra Jackson*

In February 1981, Carlos B. Wilson was dating Cassandra Jackson. Wilson and Jackson lived in San Antonio. Wilson owned a 1965 Pontiac LeMans. He had a .357 magnum derringer and some ammunition for it that he kept in the glove box of the car. On February 17, 1981, he left San Antonio for Florida in connection with his employment as a truck driver. Wilson loaned his car to Jackson to use while he was on his trip to Florida. When Wilson returned to San Antonio, he could not find Jackson or his car. On February 21, 1981, Wilson reported to police that his car had been stolen.

Also on February 21, 1981, the police found Jackson's body at a location in Bastrop County. Jackson had been shot once in the head and once in her right leg. At her autopsy, the medical examiner, Dr. Roberto G. Bayardo, recovered a fragmented copper jacket lead bullet from Jackson's brain and another bullet from her knee area. The medical examiner gave an envelope containing the bullets to Texas Ranger Ronald Stewart. Ranger Stewart submitted the bullets to the Department of Public Safety Laboratory in Austin for ballistics testing.

Ranger Stewart learned that Jackson was the subject of a missing persons report. On February 26, 1981, Ranger Stewart met with Wilson about Jackson's disappearance. After the meeting, Wilson saw his car parked on a street in downtown Austin. Wilson testified that the windows of the car were rolled down,

2

that the car keys were inside the car, and that there were five parking tickets in the seat of the car. Wilson said that the derringer that he kept in the glove box of the car was missing. As of the date of the underlying trial, no one had been tried for the murder of Jackson.

*Murder of Jimmy Milo*

As noted previously, this appeal arises from Appellant's conviction in 2011 for the 1981 murder of Jimmy Milo. During the early morning hours of February 19, 1981, police responded to a call that there had been a shooting in east Austin. Milo, who was a "transvestite," had been shot in the head. Dr. Bayardo also performed Milo's autopsy. Detective Edward Villegas was employed in the homicide division of the Austin Police Department in 1981. Through his employment as a police officer, Detective Villegas knew Milo's identity. Detective Villegas testified that Milo was a transvestite who went by the street name, "Rachel." Detective Villegas testified that he was present at Milo's autopsy and that the decedent at the autopsy was Milo. During the autopsy, Dr. Bayardo recovered a copper jacket and a lead core from a single bullet. He gave an envelope containing the pieces of the bullet to Sergeant Lloyd Polk of the Austin Police Department. Sergeant Polk submitted the envelope containing the bullet pieces to the DPS Lab in Austin for ballistics testing.

*Abduction of Barbara Bailey Scott and Attempted Capital Murder of Deputy Charles B. Lacey*

On February 19, 1981, Barbara Bailey Scott worked at her job in the comptroller's office in downtown Austin. She left work at about 7:00 p.m. and walked to her car in a nearby parking garage. Scott testified that a man, who was later identified as Appellant, followed her into the garage. She ran to her car, but Appellant continued to follow her. Appellant got into the car with her, and he drove away. Appellant was carrying a pistol in his pants. He showed the gun to Scott.

3

Later that night, Travis County Deputy Sheriff Charles B. Lacey activated the lights on his police vehicle to stop Appellant as Appellant and Scott were traveling on State Highway 183. Appellant stopped Scott's car on the side of the road. As Deputy Lacey approached the car, Appellant shot him with the pistol that he had been carrying in his pants. Scott saw Appellant shoot Deputy Lacey.

After Appellant shot Deputy Lacey, he drove away from the scene in Scott's car with Scott still inside. Appellant told Scott that he had used four bullets that day and that he had three bullets left. On February 20, 1981, at about 2:00 a.m., they stopped at a convenience store in Hempstead to get gas for the car. Appellant went into the store to pay for the gas. Scott escaped from Appellant by driving away in her car. Scott stopped at a café in Hempstead and asked someone to call the police. In the meantime, Appellant stole a car and a watch from a man in Hempstead. At about 7:45 a.m., officers attempted to stop Appellant. After a chase, the vehicle that Appellant was driving got stuck in the mud. Appellant got out of the vehicle, and the officers arrested him.

Deputy Lacey was seriously injured and was taken to the hospital. A bullet was recovered at the hospital. Lieutenant Richard Gruetzner of the Travis County Sheriff's Department submitted the bullet to the DPS Lab in Austin for testing.

Waller County Deputy Sheriff Odis Pfeiffer brought a metal detector to the scene where Appellant was arrested near Hempstead to look for a weapon in the mud. During his search, he found a two-shot derringer pistol. Deputy Pfeiffer gave the gun to Dan Fullerton of the Travis County Sherriff's Department.[1] The gun was submitted to the DPS Lab in Austin for ballistics testing. Appellant was convicted in 1982 of the attempted capital murder of Deputy Lacey in cause styled *The State*

---

[1]Pfeiffer mistakenly referred to Dan Fullerton as Don C. Fulton in his testimony in the Milo trial. Pfeiffer also testified during the Lacey trial. The record of the Lacey trial shows that Dan Fullerton was the correct name of the individual to whom Pfeiffer was referring.

4

*of Texas v. Rickey Ellison*, No. 62,502, in the 167th District Court of Travis County, Texas. The jury convicted Appellant in that trial and assessed his punishment at life in prison. Appellant appealed his 1982 conviction to the Austin Court of Appeals in Cause No. 3–83–047–CR. The Austin court affirmed the conviction.

*Events after Appellant's 1982 Conviction*

On January 3, 2001, Serena Lambright, a parole officer, interviewed Appellant for the purpose of "pre-parole." Her interview of Appellant included the matter of Milo's murder. Appellant told Lambright that he had asked a transvestite for a cigarette. Appellant told Lambright that the person responded that he did not smoke. Appellant then told Lambright that "[he] pulled out a gun and shot him in the head."

On January 22, 2007, Appellant gave a recorded interview to Austin Police Detectives Steven Meaux and Frank Dixon concerning the murder of Jackson. During the interview, Appellant said that he knew Jackson, that he had seen her at a gas station in San Antonio, and that Jackson agreed to give him a ride. Appellant admitted to the detectives that he killed Jackson with the derringer that was in the glove box of her car. However, Appellant told Detectives Meaux and Dixon during this 2007 interview that he did not remember whether he had shot Milo. Appellant admitted during his January 2007 interview with Detectives Meaux and Dixon that he shot Deputy Lacey with the derringer that he had found in the glove box of Jackson's vehicle. Appellant said that, after the officers stopped him, he dropped the derringer in the mud and stomped on it.

*Appellant's 2011 Trial for the Murder of Jimmy Milo*

Calvin S. Story Jr. testified as a ballistics expert for the State. Story testified that, in 1981, Fred Rymer was a firearms examiner and the supervisor of the

ballistics division at the DPS Lab in Austin.[2]  At that time, Story was a firearms examiner in the division.  Rymer died about five years before the underlying case went to trial.  In 1981, Rymer assigned the Jackson, Milo, and Lacey cases to himself.  Story said that Rymer fired test bullets from the derringer that was submitted to the DPS Lab.  Rymer then compared the test bullets with the bullets that were recovered in the Jackson, Milo, and Lacey cases (the evidence bullets).  After Rymer completed his examination, Story performed an independent examination of the test bullets and the evidence bullets.  Based on his own comparison of the test bullets and the evidence bullets, Story concluded that the evidence bullets in the Jackson, Milo, and Lacey cases were fired from the derringer that had been submitted to the DPS Lab.

In 2006, Detective Rick Blackmoor of the Austin Police Department resubmitted the copper jacket and a lead core from the evidence bullet in the Milo murder case to the DPS Lab for a reexamination.  Story compared the jacket portion of the bullet with the test bullets that Rymer fired from the derringer in 1981.  Based on his comparison, Story concluded that the Milo bullet and the test bullets were fired from the same derringer.

At some point after the 1981 ballistics examinations at the DPS Lab, the Travis County Sheriff's Office took possession of the derringer in question.  However, the office disposed of the gun, and it could not be located before the Milo case went to trial.  Over Appellant's objection, the State introduced a photocopy of the derringer into evidence.  Wilson testified that the photocopy depicted his derringer that he had kept in the glove box of his car.  A sticker on the gun in the photocopy shows the DPS Lab case number from 1981 (L-152950).

---

[2]Rymer's name is incorrectly spelled as "Rhymer" in the reporter's record in the Milo case.

The jury convicted Appellant of the murder of Milo. During the sentencing phase, the trial court allowed Detective Meaux to testify, over Appellant's objections, as to Appellant's reputation in the community of San Antonio in 1981 and to provide opinion testimony as to Appellant's character for violence in 1981. The trial court assessed Appellant's punishment at confinement for life.

*Analysis*

Appellant presents eight issues for review. In his first two issues, Appellant argues that the trial court erred when it admitted Story's testimony as to statements that Rymer made in connection with examination of the ballistics evidence. In his first issue, Appellant contends that Story's testimony violated his rights under the Confrontation Clause. In his second issue, he contends that Story's testimony constituted inadmissible hearsay. In his third issue, Appellant argues that the trial court erred when it admitted a photograph of the chain-of-custody sheet and evidentiary envelopes related to the ballistics evidence. Appellant contends that the envelopes contained hearsay statements and were, therefore, inadmissible. In his fourth and fifth issues, Appellant argues that the trial court erred when it allowed the medical examiner to identify the decedent as Milo. Appellant contends that the medical examiner's testimony violated his rights under the Confrontation Clause and constituted inadmissible hearsay. In his sixth through eighth issues, Appellant argues that, during the punishment phase, the trial court erred when it admitted testimony as to his reputation in the community and opinion testimony regarding his character for violence. Appellant contends that the testimony violated his rights under the Confrontation Clause and that the State failed to establish the proper predicate for admission of the testimony.

*A. Ballistics Evidence*

In his first issue, Appellant argues that the trial court violated his right to confront and cross-examine witnesses under the Sixth and Fourteenth Amendments

to the United States Constitution by allowing Story to testify that the evidentiary bullets in the Jackson, Milo, and Lacey cases were fired from the derringer that was submitted to the DPS Lab. He directs his challenge at the evidence regarding the "provenance of the test bullets." Rymer created the test bullets fired from the derringer. Story did not fire the test bullets, and he did not see Rymer fire those bullets. Appellant's argument is based on the fact that Story did not have personal knowledge that the test bullets were fired from the derringer but, instead, had to rely on statements by Rymer that he fired the test bullets from the derringer. Appellant contends that Rymer's statements about the creation of the test bullets constituted testimonial hearsay. Appellant states in his brief that "Story was not entitled to testify as to the match between the evidentiary bullets and the derringer without necessarily conveying for its testimonial truth the link between the weapon and the test bullet used to make the comparison." Thus, Appellant asserts that "the trial court erred in admitting Story's testimony of the provenance of the test bullets, and by extension, the connection between the evidentiary bullet and the weapon."

The Confrontation Clause of the Sixth Amendment, made applicable to the states via the Fourteenth Amendment, provides a right in both federal and state prosecutions to confront and cross-examine adverse witnesses. U.S. CONST. amends. VI, XIV; *Pointer v. Texas*, 380 U.S. 400, 406 (1965); *Woodall v. State*, 336 S.W.3d 634, 641 (Tex. Crim. App. 2011). The principal concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact. *Maryland v. Craig*, 497 U.S. 836, 845 (1990).

The Confrontation Clause bars the admission of out-of-court testimonial statements of a witness unless (1) the witness is unavailable to testify and (2) the defendant had a prior opportunity to cross-examine the witness. *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004); *Render v. State*, 347 S.W.3d 905, 917 (Tex.

8

App.—Eastland 2011, pet. ref'd). Post-*Crawford*, the threshold question in any Confrontation Clause analysis is whether the statements at issue are testimonial or nontestimonial in nature. *Render*, 347 S.W.3d at 917; *Campos v. State*, 256 S.W.3d 757, 761 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd). Testimonial statements are those "that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Burch v. State*, 401 S.W.3d 634, 636 (Tex. Crim. App. 2013) (quoting *Crawford*, 541 U.S. at 52). We will assume for the purpose of our analysis that Rymer's statements concerning the creation of the test bullets fired from the derringer were testimonial in nature. As set forth below, we conclude that the trial court did not violate Appellant's rights under the Confrontation Clause by permitting Story to offer testimony that relied upon Rymer's statements for his ballistics comparison testimony.

Rymer was unavailable to testify as a witness in the underlying case because he died before trial. However, Rymer testified in Appellant's 1982 trial for the attempted capital murder of Lacey.[3] Rymer testified about his ballistics examination at that trial.[4] Rymer testified that he fired the test bullets from the derringer that was submitted to the DPS Lab in 1981. Rymer said that he compared the test bullets with the bullet that was recovered in the Lacey case and that, in his opinion, the evidence bullet was fired from the derringer that was submitted to the DPS Lab. Appellant's counsel in the Lacey trial cross-examined Rymer about his creation of the test

---

[3]Story did not testify at the Lacey trial.

[4]Copies of the clerk's record and the reporter's record in the Lacey case have been filed as a supplemental reporter's record in this appeal. In this regard, we issued an order in this appeal concerning the existence of the records from the 1982 trial. We asked the parties to confirm that the records from the 1982 trial were available for their use during the underlying trial. The parties confirmed to this court that the previous record was available for their use. We additionally directed the parties to submit supplemental briefing regarding the effect of Appellant's opportunity to cross-examine Rymer in the 1982 trial on his claim under the Confrontation Clause.

bullets, his comparison of the test bullets with the evidence bullet in the Lacey case, and his conclusions. The derringer was admitted into evidence at the Lacey trial.

Under *Crawford*, "[*a*] *prior opportunity to cross-examine means an opportunity for full personal adversarial cross-examination, including attacks on credibility.*" *Coronado v. State*, 351 S.W.3d 315, 325 (Tex. Crim. App. 2011). Appellant argues in his supplemental brief that he did not have an adequate opportunity to cross-examine Rymer in connection with the Milo case because he was not a suspect at that time for Milo's murder and his trial counsel was not representing him with respect to the murder of Milo. We disagree. The Confrontation Clause does not condition the use of prior testimony on representation by the same counsel at both trials. *United States v. Richardson*, 781 F.3d 237, 244 (5th Cir. 2015) (citing *United States v. Amaya*, 533 F.2d 188, 191–92 (5th Cir.1976)), *petition for cert. filed*, (U.S. June 25, 2015) (No. 14-10434). Instead, "[a]dequate opportunity for cross-examination by competent counsel is sufficient" for compliance with the Confrontation Clause. *Id.* (alteration in original) (quoting *Amaya*, 533 F.2d at 192) (internal quotation marks omitted).

The focal point of Appellant's challenge under the Confrontation Clause is Story's use of Rymer's findings concerning the creation of the test bullets from the derringer. The record from the Lacey case shows that Appellant not only had the opportunity to cross-examine Rymer, but that his counsel actually cross-examined Rymer about the creation of the test bullets. Thus, Appellant had an adequate opportunity to cross-examine Rymer by competent counsel about the creation of the test bullets in the Lacey case. Because Rymer was not available to testify in the underlying trial, and because Appellant had an adequate opportunity to cross-examine him in the Lacey case, the Confrontation Clause did not bar the admission of Rymer's out-of-court testimonial statements about his creation of the test bullets in the underlying trial. *Crawford*, 541 U.S. at 53–54. Accordingly, the trial court

10

did not err when it allowed Story to testify that the test bullets were fired from the derringer that was submitted to the DPS Lab.

Furthermore, the Court of Criminal Appeals recently held that the testimony of an analyst who did not conduct all testing does not violate the Confrontation Clause, so long as that analyst has personal knowledge of the testing and testifies "about his or her own opinions and conclusions." *Paredes v. State*, No. PD-1043-14, 2015 WL 3486472, at *6 (Tex. Crim. App. June 3, 2015).  While Story was not the supervising analyst in the DPS lab in 1981, he did conduct his own independent comparison of the test bullets with the three other evidence bullets.  Story testified about his comparisons of the evidence bullets in the Jackson, Milo, and Lacey cases and concluded that they were all fired from the same gun.  Story then compared the evidence bullets with the test bullets, based upon the information from Rymer's test firing of the derringer.  Story's ballistics comparison testimony did not violate the Confrontation Clause because Appellant had the opportunity to cross-examine Story concerning his own opinions and conclusions.  *Id.*  In this regard, Story was "more than a surrogate for a non-testifying analyst's report."  *Id.*

However, even if we assume that the trial court erred when it admitted Story's testimony, we conclude that the error was harmless.  Error in admitting evidence in violation of the Confrontation Clause is constitutional error and, therefore, subject to a harm analysis under Rule 44.2(a) of the Texas Rules of Appellate Procedure.  TEX. R. APP. P. 44.2(a); *Langham v. State*, 305 S.W.3d 568, 582 (Tex. Crim. App. 2010).  Under Rule 44.2(a), we must reverse a judgment of conviction unless we determine beyond a reasonable doubt that the error did not contribute to the conviction.  TEX. R. APP. P. 44.2(a).  The following factors are relevant to determining whether constitutional error under *Crawford* may be declared harmless beyond a reasonable doubt: (1) the importance of the out-of-court statement to the State's case; (2) whether the statement was cumulative of other evidence; (3) the

11

presence or absence of evidence corroborating or contradicting the statement on material points; and (4) the overall strength of the State's case. *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007); *Davis v. State*, 203 S.W.3d 845, 852 (Tex. Crim. App. 2006); *Render*, 347 S.W.3d at 919–20. Thus, the presence of overwhelming evidence supporting the finding in question can be a factor in the evaluation of harmless error. *Motilla v. State*, 78 S.W.3d 352, 357 (Tex. Crim. App. 2002); *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000).

The emphasis of a harm analysis under Rule 44.2(a) should not be on the propriety of the outcome of trial. *Scott*, 227 S.W.3d at 690. Rather, we must determine whether the error adversely affected the integrity of the process leading to the conviction. *Id.* The question for the reviewing court is not whether the jury verdict was supported by the evidence. *Id.* Instead, the question is the likelihood that the constitutional error was actually a contributing factor in the jury's deliberations in arriving at the verdict. *Id.* In performing a harm analysis, a reviewing court may also consider the source and nature of the error, the amount of emphasis by the State on the erroneously admitted evidence, and the weight the jury may have given the erroneously admitted evidence compared to the balance of the evidence with respect to the element or defensive issue to which it is relevant. *Id.*

With the above considerations in mind, we must determine whether there is a reasonable possibility that the *Crawford* error moved the jury from a state of non-persuasion to one of persuasion on a particular issue. *Scott*, 227 S.W.3d at 690; *Davis*, 203 S.W.3d at 852–53. Ultimately, if we are to affirm, we must be satisfied beyond a reasonable doubt, after considering the various factors, that the error did not contribute to the conviction. *Scott*, 227 S.W.3d at 690–91.

Rymer's statements concerning the test bullets were not imperative to the State's case because the State presented other compelling evidence that the evidence bullets in the Jackson, Milo, and Lacey cases were all fired from the same derringer.

12

Wilson had the derringer in the glove box of his car. Appellant told the detectives that he took the derringer from the glove box. Scott saw Appellant shoot Deputy Lacey with a pistol. Deputy Pfeiffer found the derringer buried in the mud at the location where Appellant was arrested. Appellant told the detectives that he dropped the gun in the mud and then stomped on it. Appellant admitted to the detectives that he shot Jackson and Deputy Lacey with the derringer. Appellant told Lambright that "[he] pulled out a gun and shot [the transvestite] in the head."

Story's testimony showed that the evidence bullets in the Jackson, Milo, and Lacey cases were all fired from the same gun. Story did not need the test bullets to reach this conclusion. Story could have reached this conclusion simply by comparing the evidence bullets with each other. The existence of the test bullets allowed Story to conclude that the evidence bullets were fired from a specific gun—the derringer. Story's conclusion that the evidence bullets were fired from the derringer is cumulative of, and corroborated by, other evidence, including Appellant's admissions that he shot Jackson and Lacey with the same derringer, Appellant's admission to Lambright that he shot the transvestite in the head, Scott's testimony that she saw Appellant shoot Deputy Lacey, and the officer's discovery of the derringer in the mud at the arrest scene. Therefore, we conclude that evidence of Rymer's statements would not have materially affected the jury's deliberations in arriving at the verdict.

After carefully reviewing the record, we conclude beyond a reasonable doubt that any error in admitting Rymer's statements did not contribute to Appellant's conviction or punishment. Therefore, any error was harmless. Appellant's first issue is overruled.

Appellant asserts in his second issue that the trial court erred in overruling his hearsay objection to Story's testimony concerning Rymer's findings about the creation of the test bullets. We review a trial court's ruling on admissibility of

13

evidence for an abuse of discretion. *Coble v. State*, 330 S.W.3d 253, 272 (Tex. Crim. App. 2010). We will uphold the trial court's decision unless it lies outside the zone of reasonable disagreement. *Salazar v. State*, 38 S.W.3d 141, 153–54 (Tex. Crim. App. 2001).

Hearsay is a statement, other than one made by the declarant while testifying at trial, that is offered to prove the truth of the matter asserted. TEX. R. EVID. 801(d); *see Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002). Relying upon Rule 703 of the Texas Rules of Evidence, the State contends that Story was permitted to base his opinions on Rymer's findings even if they constituted inadmissible hearsay if the information was of a type reasonably relied upon by experts in the field. In this regard, Story testified that it is common for ballistics experts to use test bullets created by other experts. We agree with the State's contention. Under Rule 703, an expert may base an opinion solely on hearsay. *Martinez v. State*, 22 S.W.3d 504, 508 (Tex. Crim. App. 2000); *Aguilar v. State*, 887 S.W.2d 27, 29 & n.8 (Tex. Crim. App. 1994). Based upon Story's testimony, the trial court did not err in overruling Appellant's hearsay objection.

Moreover, the violation of an evidentiary rule that results in the erroneous admission of evidence constitutes nonconstitutional error. *See Geuder v. State*, 142 S.W.3d 372, 376 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd). As such, it is subject to a harm analysis under Rule 44.2(b) of the Texas Rules of Appellate Procedure. TEX. R. APP. P. 44.2(b); *Motilla*, 78 S.W.3d at 355; *Gately v. State*, 321 S.W.3d 72, 77 (Tex. App.—Eastland 2010, no pet.). Under Rule 44.2(b), we are to disregard any error unless it affected the defendant's substantial rights. TEX. R. APP. P. 44.2(b). We have concluded that any error by the trial court in admitting Rymer's statements was harmless under the more stringent standards imposed by Rule 44.2(a) for analyzing harm of constitutional errors. Therefore, even assuming that Rymer's statements were inadmissible hearsay under the Rules of Evidence, we

need not conduct a separate harm analysis under the less stringent standard imposed by Rule 44.2(b) for analyzing harm of nonconstitutional errors. *Guidry v. State*, 9 S.W.3d 133, 151 n.14 (Tex. Crim. App. 1999); *Render*, 347 S.W.3d at 920. Appellant's second issue is overruled.

*B. Chain of Custody and Evidence Envelopes*

In his third issue, Appellant challenges the admission of a photograph depicting the chain of custody and evidence envelopes. The State offered a photograph of the submission sheet, envelopes, and two bullets. Appellant objected on hearsay and confrontation grounds. The trial court overruled the objections and admitted the photograph.

During Story's redirect examination, he testified that the DPS lab requires a submission sheet that lists all of the items being submitted for analysis. The analyst takes the submission sheet with the evidence and "generate[s] an evidence record sheet in which states that this particular person received the evidence in this case from this particular person on this date at this time." Story noted that, in 1981, the DPS lab received the evidence and submitted the documentation. The evidence was assigned a lab number: L-152933. In 2006, Story documented the submission of new evidence to be analyzed. That evidence included two envelopes, two bullets, and a submission sheet. The envelopes and the submission sheet were labeled L-152933, as noted in the photograph.

We review a trial court's decision to admit photographs for an abuse of discretion. *Paredes v. State*, 129 S.W.3d 530, 539 (Tex. Crim. App. 2004). A photograph is generally admissible if verbal testimony about the matters depicted in the photograph is also admissible. *Id.* The photograph showed that Story examined the bullets that were in an envelope that matched the description given by Dr. Bayardo in earlier testimony. Also, Story testified about the DPS lab procedures that were employed when evidence was submitted for analysis both in 1982 and

15

2006. Story referred to the photo to help explain this testimony. The photograph was not admitted for any truth of the matter asserted. Accordingly, the trial court did not abuse its discretion when it admitted the photograph.

Furthermore, based on our harm analysis in issue one, the admission of the photograph was not harmful. As noted previously, a violation of the evidentiary rules resulting in the erroneous admission is nonconstitutional error and is, therefore, subject to a harm analysis under Rule 44.2(b) of the Texas Rules of Appellate Procedure. TEX. R. APP. P. 44.2(b); *Motilla*, 78 S.W.3d at 355; *Gately*, 321 S.W.3d at 77. Under Rule 44.2(b), we are to disregard any error unless it affected the defendant's substantial rights. TEX. R. APP. P. 44.2(b). The photograph, and Story's testimony, showed that the evidence bullets in the Jackson, Milo, and Lacey cases were all fired from the same gun tested in 1982. The existence of the test bullets, and the documents showing chain of custody, allowed Story to corroborate his testimony that the evidence bullets were fired from a specific gun. The photograph also corroborated Dr. Bayardo's testimony about how he gave the bullets he removed at the autopsy to the police. To the extent that the photograph indicated that the evidence bullets were fired from the derringer, it is cumulative of other evidence as noted above. Therefore, we conclude that any error in the admission of the photograph into evidence did not affect Appellant's substantial rights and must be disregarded. We overrule Appellant's third issue.

*C. Medical Examiner's Identification of Victim*

In his fourth and fifth issues, Appellant contends that the trial court erred when it allowed the medical examiner to identify the body as Milo. Appellant asserts that Dr. Bayardo did not know Milo and, therefore, had to rely on hearsay statements of the police officers to identify Milo. Appellant argues that Dr. Bayardo's testimony as to the identity of Milo violated his rights under the Confrontation Clause and constituted inadmissible hearsay.

16

Dr. Bayardo testified that, on the morning of February 19, 1981, he arrived at the morgue to do an autopsy on "Jimmy Lasorge Milo." He described the following procedure regarding the identification of bodies prior to his performance of an autopsy: "[E]verybody is toe tagged. So the tag has the name, the date of birth, the race, whatever information is available at that point." He testified that he relied upon the information written on the toe tag as well as the medical investigator's "written report that comes with the body." The medical investigator would have written the information on the report based upon what he or she collected at the "scene of the crime."

Detective Villegas, who testified earlier during the trial, investigated the murder of Milo in 1981. Detective Villegas testified at the underlying trial that he knew Milo, was present at the autopsy, and identified the decedent as Milo. This is substantively the same testimony elicited during Dr. Bayardo's direct examination regarding the identity of Milo's body.

Assuming, without deciding, that the trial court erroneously admitted Dr. Bayardo's testimony regarding the identity of Milo in violation of the Rules of Evidence and the Confrontation Clause, such errors are subject to a harm analysis. *See* TEX. R. APP. P. 44.2; *Rubio v. State*, 241 S.W.3d 1, 3 (Tex. Crim. App. 2007) ("[A]ny Confrontation Clause violation, once proven, is subject to harmless error analysis."); *Clay v. State*, 240 S.W.3d 895, 905–06 (Tex. Crim. App. 2007) (conducting harmless error analysis on hearsay).

When a trial court erroneously admits hearsay, but the matter asserted by the out-of-court statement is otherwise established through other admitted evidence, no harm is done to the party challenging the hearsay. *See Clay*, 240 S.W.3d at 905–06 (holding that erroneously admitted hearsay "established little, if anything, negative about appellant that was not also well established by the properly admitted evidence" and was therefore harmless); *Burks v. State*, 876 S.W.2d 877, 898 (Tex. Crim. App.

17

1994) (holding that erroneously admitted backdoor hearsay was harmless because other testimony proved same facts); *Jones v. State*, 843 S.W.2d 487, 499 n.14 (Tex. Crim. App. 1992) (observing that potential error of admitting backdoor hearsay was harmless because jury heard similar evidence from other sources). The same rule applies with respect to evidence elicited in violation of the Confrontation Clause. *See Davis*, 203 S.W.3d at 853–56 (observing that testimony admitted in violation of Confrontation Clause was cumulative of other admitted evidence and any error was harmless beyond a reasonable doubt).

In this case, the alleged error is that Dr. Bayardo provided hearsay establishing that the identity of the body on which he performed an autopsy was Milo, and Appellant argues that this error violated his right to confront the police officer who identified Milo's body. However, Dr. Bayardo testified after Detective Villegas, and Detective Villegas had already testified that he had gone to the morgue, saw Dr. Bayardo, and identified Milo's body at the autopsy. Appellant had the opportunity to cross-examine Detective Villegas on this point. In light of the testimony of Detective Villegas, we conclude that there is no reasonable likelihood that the alleged error of admitting substantially the same testimony by Dr. Bayardo materially affected the outcome of the jury's deliberations. Thus, assuming that the trial court erred in admitting hearsay during Dr. Bayardo's testimony in violation of the Confrontation Clause, we hold that the alleged error was harmless. *See* TEX. R. APP. P. 44.2(a); *Clay*, 240 S.W.3d at 905–06; *Davis*, 203 S.W.3d at 853–56; *Burks*, 876 S.W.2d at 898; *Jones*, 843 S.W.2d at 499 n.14. We overrule Appellant's fourth and fifth issues.

### D. Reputation and Opinion Testimony

In his sixth through eighth issues, Appellant argues that, during the punishment phase, the trial court erred when it allowed former Detective Meaux to testify as to Appellant's reputation in the San Antonio community in 1981 and

18

Appellant's character for violence. Specifically, his sixth issue challenges the admission of this testimony under the Confrontation Clause,[5] his seventh issue challenges the admission of this testimony without a sufficient predicate, and his eighth issue challenges the admission of this testimony as improper opinion testimony of his character for violence.

Detective Meaux's punishment testimony was very brief. Detective Meaux had no personal knowledge of Appellant's reputation in the community in 1981 or Appellant's character for violence at the time. Detective Meaux interviewed another police officer from San Antonio to determine Appellant's reputation in the community. Detective Meaux simply testified that Appellant was "very bad" and "very violent."

Assuming, without deciding, that the trial court erroneously admitted Detective Meaux's testimony regarding the reputation and character evidence of Appellant from 1981, such errors are subject to a harm analysis. TEX. R. APP. P. 44.2; *Rubio*, 241 S.W.3d at 3; *Clay*, 240 S.W.3d at 905–06.

We are persuaded beyond a reasonable doubt that the court's punishment would have been the same even if the trial court had not admitted Detective Meaux's testimony concerning Appellant's reputation and character. *Russeau*, 171 S.W.3d at 881 (even if the trial court erred under the Confrontation Clause in admitting punishment evidence, we nevertheless will affirm if we determine beyond a reasonable doubt that the harm from the error did not contribute to the defendant's punishment). We have discussed at length the properly admitted evidence against Appellant, including Appellant's admission that he shot Jackson and Lacey with the

---

[5]The State asserts that the protections afforded by the Confrontation Clause do not apply to the punishment phase of a criminal trial. However, the Court of Criminal Appeals has held otherwise. *Russeau v. State*, 171 S.W.3d 871, 880 (Tex. Crim. App. 2005). We have also recognized that the Confrontation Clause applies during the punishment phase of a criminal trial. *Walker v. State*, 406 S.W.3d 590, 594 (Tex. App.—Eastland 2013, pet. ref'd); *see also Dixon v. State*, 244 S.W.3d 472, 482–83 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd).

same derringer, Appellant's admission that he shot Milo in the head, and Scott's testimony that she saw Appellant shoot Deputy Lacey. The State also introduced evidence of Appellant's prior convictions. To the extent that the trial court may have erroneously admitted reputation evidence, it paled in comparison to the direct evidence of Appellant's egregious conduct. The challenged evidence established little, if anything, negative about Appellant that was not also well established by the properly admitted evidence. Accordingly, we overrule Appellant's sixth, seventh, and eighth issues.

### *This Court's Ruling*

We affirm the judgment of the trial court.


JOHN M. BAILEY

JUSTICE


August 13, 2015

Publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.